AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>TAMAYA DENNARD<br><br>_Defendant(s)_ | )<br>)<br>) Case No. 1:20MJ-198<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____SEE AFFIDAVIT_____ in the county of _____Hamilton_____ in the
___Southern___ District of _____Ohio_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1346 and 1343 | Honest Services Wire Fraud, |
| 18 U.S.C. 666 | Bribery Concerning Programs Receiving Federal Funds, and |
| 18 U.S.C. 1951 | Attempted Extortion Under Color of Right |

This criminal complaint is based on these facts:

See Affidavit

☒ Continued on the attached sheet.

_Complainant's signature_

Nathan Holbrook, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 2/24/20

_Judge's signature_

City and state: Cincinnati, Ohio
Hon. Karen L. Litkovitz, U.S. Magistrate Judge
_Printed name and title_

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES<br><br>V.<br><br>TAMAYA DENNARD | Case No. 1:20MJ-198<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Nathan Holbrook, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint against **TAMAYA DENNARD**. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for over eight years. In July 2011, I was assigned to the Merrillville Resident Agency Office to work white collar crimes and public corruption investigations. In joining the FBI as a Special Agent, I initially spent five months at the FBI training academy in Quantico, Virginia, where I studied numerous investigative techniques, including those involved in white collar/public corruption investigations.

2. I was a member of the Northwest Indiana Public Corruption Task Force from August 2011 until December 2017. This task force focused on public corruption investigations throughout Northwest Indiana and was compromised of several federal law enforcement agencies, including the FBI and the Internal Revenue Service (IRS). As part of my duties while a member of this task force, I was involved in numerous public corruption investigations including investigations of elected public officials, non-elected government employees, and corrupt law enforcement officers. In the course of these investigations, and through my involvement in other

1

investigations with other experienced white collar/public corruption investigators, I have participated in white collar and/or public corruption investigations involving the use of Title III communication intercepts, confidential surreptitious undercover recordings, electronic tracking devices, pen registers and trap and trace devices, and various types of search warrants for GPS locate information, government offices, and government computer systems.

3. In January of 2018, I was transferred to the Cincinnati Division of the FBI and assigned to a white collar/public corruption unit, specifically to investigate public corruption in Southern Ohio to include bribery, extortion, and theft of funds from programs receiving government money. Since my assignment to the Cincinnati Division, I have conducted or participated in public corruption investigations utilizing advanced techniques to include the use of: Undercover Employees (UCEs); confidential human sources; consensual undercover recordings; Title IIIs; physical surveillance; pen registers and trap and trace devices; and the analysis of financial records.

4. Prior to my service with the FBI, I was employed as a Manager of Clinical Operations for a major national healthcare provider in Ohio, managing the operations of seven regional facilities. My formal education includes a Bachelor of Science degree and a Master's Degree in Business Administration (MBA).

5. The information set forth in this affidavit was obtained during the course of my employment with the FBI, through personal observations, the statements of witnesses/cooperators, and recordings of conversations. Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause that federal crimes have been committed.

6. As set forth in this affidavit, there is probable cause to believe that **TAMAYA DENNARD** committed honest services wire fraud, in violation of 18 U.S.C. §§ 1346 and 1343, bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666, and attempted extortion under color of right, in violation of 18 U.S.C. § 1951.

## PROBABLE CAUSE

7. The City of Cincinnati is a municipal corporation and political subdivision of the State of Ohio located in the Southern District of Ohio. The City of Cincinnati received federal benefits in excess of $10,000 during the twelve-month period preceding September 2019.

8. Cincinnati City Council is the legislative body for the City of Cincinnati. The Council is comprised of nine members, and is responsible for enacting ordinances, imposing taxes, and making appropriations, establishing policy, and hiring some city officials. The current council members are serving four-year terms.[1]

9. **DENNARD** is a black female, her date of birth is March 22, 1979. **DENNARD** is approximately five feet, four inches tall and has brown hair and brown eyes. **DENNARD's** Social Security Account Number is XXX-XX--1683. According to **DENNARD's** website, following her graduation from the University of Cincinnati with a degree in international business, she went to work for Duke Energy. **DENNARD** reportedly left Duke Energy to work for Cincinnati City Councilmember P.G. Sittenfeld. **DENNARD** left Sittenfeld's office in 2015 to take the role of political director for Sittenfeld's campaign for United States Senate.

---

[1] In November of 2018, city voters approved an amendment to the Cincinnati Charter to limit Council terms to two years beginning with council members elected in 2021.

10. **DENNARD** was elected to the Cincinnati City Council in November of 2017, finishing in sixth place for the nine-member council, to serve a four-year term. **DENNARD** is the current President Pro Tem for the council and is also the Chairperson for the Equity, Inclusion, Youth, and the Arts Committee; Vice Chairperson for the Major Projects and Smart Government Committee; and a member of the Budget and Finance Committee.

11. As a current member of Cincinnati City Council, **DENNARD** is an agent of the City of Cincinnati, that is, she is employed as elected member of the City of Cincinnati City Council, and a "public official," who owes a duty of honest services to the citizens of the City of Cincinnati and to the Cincinnati City Council.

12. As set forth below, between at least August 2019 and December 2019, **DENNARD** engaged in a scheme to defraud the citizens of Cincinnati of her honest services as a council member. More specifically, she engaged in acts and attempted acts of bribery and extortion, attempting to exchange her votes for money.

13. CHS is employed by a law firm located in the greater Cincinnati area, whose business affects interstate commerce. CHS specializes in negotiating large-scale development projects in the Cincinnati region. Through CHS's employment with his/her firm and CHS's expertise in negotiating development projects, CHS became involved in a proposed large scale development project for the downtown Cincinnati river bank (hereinafter referred to as the "bank's development") that affects and has an impact on interstate commerce. As described below, CHS contacted law enforcement after an interaction with **DENNARD**, believing that CHS had a moral and ethical obligation to report criminal wrongdoing and to assist law enforcement. After contacting law enforcement, CHS acted at the direction of law enforcement to assist law enforcement in its investigation of criminal activity.

4

14. The bank's development encompasses a large section of the Ohio River bank in Cincinnati, Ohio and has undergone phases of development. The next phase of development involves adding a music venue to the area. In order for the bank's development project to progress, Hilltop Companies (hereinafter referred to as "Hilltop") must be relocated from its current location just west of Paul Brown Stadium. Hilltop has multiple business locations to include Butler, KY; Maysville, KY; Battletown, KY; Patriot, IN; and Cincinnati, OH. Hilltop produces ready mix concrete and aggregate product to include crushed stone, sand, and gravel. CHS's firm represents a stakeholder in the bank's development, which has advocated for and would benefit from the relocation of Hilltop from its current location on the river bank in downtown Cincinnati.

15. One potential solution for the relocation of Hilltop required a land swap between the City of Cincinnati and Hilltop. Hilltop had a parcel of land under contract, referred to as the West Mill Creek site, which would be swapped for the same size of land owned by the City of Cincinnati, referred to as the East Mill Creek site. The land swap deal required approval of the Budget and Finance Committee, followed by approval of City Council.

16. On or around August 12, 2019, an email was sent to members of City Council, including **DENNARD**, for the purpose of scheduling meetings with council members to discuss the bank's development and the Hilltop land swap.

17. On Wednesday, August 14, 2019, **DENNARD** sent an email to CHS requesting to meet CHS. CHS told me he/she was surprised to receive the direct communication from **DENNARD**, because CHS had only met **DENNARD** one time for approximately 15 minutes around March or April of 2019. Although not specifically stated, CHS assumed the purpose of the meeting was to update **DENNARD** on the bank's development and Hilltop land swap. CHS agreed to meet **DENNARD** in person on August 15, 2019.

18. On the morning of August 15, 2019, at approximately 7:07 am, **DENNARD**, sent the following text message to CHS[2]:

> **DENNARD:** *"Good morning [CHS]! It's Tamaya. I had a bit of an emergency come up this morning. Can we please schedule a call for this afternoon? I apologize for any inconvenience"*[3]

CHS replied:

> **CHS:** *"Ok. No problem Tamaya. Hope all is okay. A call would be fine but a meeting to walk through with the visuals of the issue would be most helpful. Have a packet of information for you too. Can meet before 2 and after 3:30 today any place that works for you. [CHS]"*

19. On Friday, August 16, 2019, **DENNARD** called CHS at approximately 1:05 pm.[4] The call lasted approximately ten minutes. CHS told me about the conversation he/she had with **DENNARD**. During the call, **DENNARD** requested $10,000 from CHS to pay for personal expenses. **DENNARD** explained the money was needed to pay rent, place a down payment on a car, and pay attorney fees. Later in the phone call, **DENNARD** requested $15,000 from CHS to pay for personal expenses. CHS told me he/she offered suggestions to **DENNARD** on how to handle **DENNARD's** personal financial difficulties, but did not offer to provide money to **DENNARD**. CHS noted **DENNARD** saying several times during their conversation that **DENNARD** did "not know how this works." Later that same day, at approximately 7:24 pm, CHS sent the following text to **DENNARD**:

> **CHS:** *Tamaya- I will not be able to meet with you. Unfortunately, I will not be able to discuss or help you with your personal situation. [CHS]*

---

[2] Records obtained via grand jury subpoena indicated target telephone number was subscribed to by **DENNARD**.

[3] I have reviewed all text messages described in this affidavit. The text messages were provided to me by CHS.

[4] The telephone call was not recorded as it was placed prior to the CHS's assistance to the FBI, but has been verified as having occurred through telephone records.

6

Also on the same day, August 16, 2019, at approximately 8:30 pm, **DENNARD** sent the following text message to CHS:

> **DENNARD:** *"[CHS] After speaking with you today, I felt like a weight had been lifted off of my shoulders. You seemed genuinely interested in helping me and I genuinely need help. The tone of our conversation was hopeful. This text is dry and it feels as if something is stopping you. Is it my politics? I don't have any other avenues. I called because I literally am out of options. Can you please tell me why people won't help? What I need to get my head above water is a pittance to many who are able. I have $200 in my account. I got into a rough spot trying to help my mom and now I have nothing. I appreciate you taking my call and being willing to help today"*

20. On Saturday, August 17, 2019, at approximately 7:06 am, **DENNARD**, sent to CHS a photograph of a document title "NOTICE TO LEAVE THE PREMISES" addressed to **DENNARD**, with the accompanying text message:

> **DENNARD:** *"If you are willing to meet with me, I'm sure that I will be able to help you."*

21. CHS responded to **DENNARD** on the same day at approximately 9:24 am, stating:

> **CHS:** *Tamaya- I suggest you contact Legal Aid about your eviction notice and financial situation. I feel bad about your situation, which is why I offered some suggestions yesterday about where you might get some help. It appears now you are asking me personally for help. Given my role with the [CHS's client] it would be totally inappropriate for me to represent you or provide any financial assistance. Please don't suggest it again.*

22. Thereafter, CHS contacted federal law enforcement regarding **DENNARD's** communications and request for money from someone with business before City Council. CHS provided copies of the text messages described above and began assisting the FBI, by reinitiating contact with **DENNARD** at FBI's direction.

23. On August 31, 2019, at FBI's direction, CHS conducted a consensually recorded telephone call to **DENNARD**, which she did not answer. CHS left a message for **DENNARD** saying that CHS was thinking about **DENNARD** and felt bad about **DENNARD's** situation and wanted to see if there was still a way that he/she could help.

7

24. On Wednesday, September 4, 2019, **DENNARD** sent the following text message to CHS:

> **DENNARD**: *Hello. I appreciate your voicemail. I appreciate your willingness to help out. Please let me know if you have time to meet soon.*

25. Via text messages, CHS and **DENNARD** agreed to meet the following morning at 8:00 am.

26. On Thursday, September 5, 2019, CHS met **DENNARD**. CHS was equipped with an FBI audio recording device to capture the meeting. Early in the meeting, **DENNARD** told CHS about **DENNARD's** personal financial troubles, after which **DENNARD** requested $10,000. I reviewed the recording of the meeting, which included the following conversation:

> **DENNARD**: *It's more of like trying to get a car and, like I said, money for a new place to live and then just a little bit of breathing room. And (UI) I think, you know, It's kind of hard to get that head space.*
>
> **CHS**: *So you still…I mean what do you, what do you think you're gonna need, I mean…*
>
> **DENNARD**: *Probably like ten.*
>
> **CHS**: *Ten?*
>
> **DENNARD**: *Yeah. Because like you know apartment, it's like you gotta put down first month's rent and like a deposit. And then also a car, probably like…I've been looking, probably like I put down twenty-five to three thousand dollars to get a car, you know, not a new car.*

Following the request of $10,000, CHS proceeded to explain the Hilltop land swap deal to **DENNARD** and told **DENNARD** that the mayor is opposed to the Hilltop land swap. CHS and **DENNARD** discussed the positions of the other council members regarding approval of the Hilltop land swap. CHS told **DENNARD** that he/she needed council support to get the Hilltop land swap proposal in a committee.

> **CHS**: *I think that's the first thing is can we get the signatures on a resolution that then puts it in front of council to say yes let's get this into our committee, let's use our committee process, you know to figure out the merits of this thing.*

8

>**DENNARD:** *I don't think it will be an issue of getting the six signatures just to get it into committee or...what we can do too, we can either do a motion, we can just suspend the rules, six of us, you know what I mean...*

**DENNARD** explained that during a council meeting, a council member can make a motion to suspend the rules which would require six votes. Once the rules are suspended council can vote on "anything we need to vote on." **DENNARD** told CHS "the super majority is everything." **DENNARD** explained that even if the mayor did place an issue on the agenda, the council can still bring it forward.

27. Later in the conversation, **DENNARD** again told CHS that **DENNARD** needed $10,000. **DENNARD** told CHS, referring to the $10,000, "and then like I said something I can payback probably like no more than $200 a month." CHS asked **DENNARD** if she wanted the money wired to her bank account. **DENNARD** told CHS she never did a wire before, but whatever is "feasible or easiest." CHS explained to **DENNARD** that a wire would require a bank account number and the bank's routing number or CHS could give **DENNARD** a check. **DENNARD** responded, "Check is cool. Like and then I would like (UI) like have a note or something, like, you know what I mean. Like some sort of like so I'm not, you know I want to make sure I'm being what do they call it, I'm ethical." **DENNARD** suggested a promissory note to repay the $10,000.

28. At the end of the meeting, CHS asked **DENNARD** to text her the bank routing number and account number. CHS explained the money would not come from him, but rather it would come from a limited liability company account. CHS and **DENNARD** then had the following conversation:

>**CHS:** *Do you think, you know, can we count on your support with what we're talking about here?*
>
>**DENNARD:** *Sure, mmm-hmm. Yeah.*
>
>**CHS:** *Yeah, we're good on that?*

9

**DENNARD**: *Yeah.*

**CHS**: *Okay*

**DENNARD**: *If, if, I don't...let me, let me read, because I'm still...but I'll, let me, let me spend some time with this today and I'll reach out to you.*

29. Later the same day as the meeting, **DENNARD** sent CHS the following text message:

**DENNARD:** *Hi [CHS]! I wanted to talk to see if $15K is doable. I have created a promissory note of 6 years and payments of $215/month.*

This text message also contained **DENNARD's** bank routing information, followed by a request for the transaction to occur more quickly:

**DENNARD:** *It would awesome if this were initiated today so that I can return this rental car*

CHS responded to the text message by explaining that he/she was busy with work meetings and requested to talk later that day (September 5, 2019). **DENNARD** replied:

**DENNARD:** *I understand. If it gets too late for a wire, I can also pick up a check?*

30. The next morning, Friday, September 6, 2019, **DENNARD** sent CHS the following text message:

**DENNARD:** *It's totally cool if you don't have time to talk. If you could just let me know if/when the wire could be initiated, that would be most helpful.*

31. Later on the same day, September 6, 2019, CHS conducted a consensually recorded telephone call to **DENNARD**. I reviewed the recording. During the call, CHS and **DENNARD** discussed the $15,000 requested by **DENNARD** in a previous text message. CHS told **DENNARD** that he/she could give her the money on Monday morning (September 9, 2019). **DENNARD** asked CHS if that was as soon as he/she could do it (deliver the money). **DENNARD** told CHS that she had applied for an apartment and wanted to move fast because there was a

10

waiting list for the apartment. CHS told **DENNARD** to plan to obtain the money from CHS early on Monday and if CHS can do something sooner, he/she will. At this point in the telephone call the following conversation ensued:

> **CHS**: *So I'll give you ten thousand now...*
>
> **DENNARD**: *Mmm-hmm*
>
> **CHS**: *...and you're, you're good with sup...you're good with supporting Hilltop's proposal to do the land swap...*
>
> **DENNARD**: *Mmm-hmm. Yes.*
>
> **CHS**: *...when it comes before council? We're...cool awesome.*
>
> **DENNARD**: *Mmm-hmm.*
>
> **CHS**: *And then, and then I think as this thing goes through, I mean, if...probably the most, the most important vote will be the, the first vote and then there's probably going to be a second vote and if you can hold on, you know, I can give you the five thousand after that second vote if that's good with you.*
>
> **DENNARD**: *Um, yeah, that's, that's fine.*

At the end of the telephone conversation, **DENNARD** again requested that CHS let her know if he/she can do something sooner even if it's not the full $10,000.

32. On Saturday, September 7, 2019, CHS stated that he/she "was not able to move funds yesterday. I will have what you requested Monday morning though." **DENNARD** responded that her account was negative and that "Monday is an eternity away." She then sent following text messages:

> **DENNARD**: *With this music venue, I don't have a dog in the fight.*
>
> **DENNARD**: *It's wealthy people fighting to be more wealthy.*

33. On Sunday, September 8, 2019, CHS and **DENNARD** exchanged the following text messages:

> **CHS**: *Will have what we discussed around 10:30. Does that work for you?*

11

> **DENNARD**: *Thank you. I actually need it first thing. I'm on borrowed time with this rental car*

34. On the morning of Monday, September 9, 2019, CHS and **DENNARD**, exchanged the following test messages:

> **DENNARD**: *Good morning, [CHS]. Is there a way to meet up sooner this morning than 10:30. The rental car company opens at 8.*
>
> **CHS**: *Hey Tamaya- I could swing by Coffee Emporium on the way to a meeting. 9:20-9:30 okay?*
>
> **DENNARD**: *Thank you. That would be great. Is everything certified because I don't have anytime for holds or allowing things to clear.*

35. Later in the morning on September 9, 2019, at approximately 9:23 am, CHS met **DENNARD** in downtown Cincinnati. CHS again was equipped with an audio recording device. During the meeting, CHS provided **DENNARD** with a $10,000 check. I reviewed the recording. During the brief meeting the following conversation ensued:

> **CHS**: *This could be our table. So here, this is the ten thousand that we talked about.*
> **DENNARD**: *Alright, okay.*
> **CHS**: *And uh, that's a cashier's check*
> **DENNARD**: *Oh, that's perfect. Thank you.*
> **CHS**: *So that will go right through.*
> **DENNARD**: *I'm going right to the bank on this. Thank you.*
> **CHS**: *Alright?*
> **DENNARD**: *Appreciate you.*

36. As the above communications demonstrate, **DENNARD** agreed to vote for the Hilltop land swap proposal in exchange for $10,000. She further agreed to a payment of $5000 following a second vote. Although she previously mentioned a promissory note in passing, she never brought it up again.

37. Bank records indicate that **DENNARD** deposited the $10,000 check provided by CHS into a personal account controlled by **DENNARD** on September 9, 2019.

38. On September 18, 2019, **DENNARD** called CHS and left a voice message stating she "needs a huge favor" from CHS. She followed up with a text the next day that stated, "I will need remaining by tomorrow. Have an emergency." After exchanging multiple messages, the CHS stated, "Sorry, will get back to you. Just been slammed," **DENNARD** responded by stating, "I understand. You're incredibly busy, I thought I was. Just need the remaining by tomorrow. We don't have to talk. One less thing for you to do." She follows up with a text that stated, "This is imperative. That's why I've been trying to reach you for the last 3 days."

39. That same day, September 20, 2019, CHS and **DENNARD** spoke by telephone. The call was consensually recorded and I reviewed the recording. During the call, **DENNARD** stated she would vote for the bill but that she needed the $5,000 now. Specifically, **DENNARD** confirmed that she needed "the other five," and that "you don't have to worry about" her vote. Later that day, CHS arranged for $5,000 cash delivery to **DENNARD**, which was completed the same day.

40. Also on or about September 20, 2019, the same day **DENNARD** received the $5,000 cash, **DENNARD** booked two seats on a September 22, 2019 flight from Cincinnati Northern Kentucky Airport bound for Destin-Fort Walton Beach Airport. On or about September 22, 2019, **DENNARD** deposited $4,600 cash in a personal bank account. Then, on or about September 27, 2019, **DENNARD** booked two seats on a September 29, 2019 flight from St. Petersburg-Clearwater International Airport to Cincinnati Northern Kentucky Airport. One seat was reserved in **DENNARD**'s name, the second seat was reserved in the name of an associate of **DENNARD**. Financial records indicate **DENNARD** spent in excess of $4,000 on the Florida trip

from September 22, 2019 to September 29, 2019 to include accommodations at the Opal Sands Resort in Clearwater Beach, Florida and airfare.

41. On October 2, 2019, City Council rejected the land swap deal, with Dennard voting in favor of the deal (opposing the mayor's motion against the deal) as promised.

42. Following the vote, **DENNARD** has continued contacting CHS for money, while tying the payments to help she could provide in return.

43. For example, on October 11, 2019, **DENNARD** sent CHS a text message at approximately 7:35 am, stating, in part, "I just need your help of $1,200 today." When CHS did not immediately respond, **DENNARD** sent a follow-up text at approximately 11:57 am, stating "[CHS], I really need your help. Please respond." A few hours later, **DENNARD** continued, "Hi! I'm with you. But a few competing interest [sic] have reached out. I at least want to know that you've read my texts and give a damn."

44. On or about November 2, 2019, at approximately 4:06 pm, CHS executed a consensually recorded telephone call to **DENNARD**. During the telephone call, CHS told **DENNARD** that the next issue in regards to the building of the music venue on the banks related to a zoning change. CHS stated the zoning issue was tying things up, and then stated, "these other things, I guess, Tamaya, we're just going to have to tackle them," to which **DENNARD** responded, "yeah." **DENNARD** stated, "I haven't seen anything come across, so I was, that's what I was wondering, I knew there would be some things coming up, but wasn't sure exactly what." **DENNARD** then told CHS to keep her "in the loop on everything." Just minutes after the call ended, **DENNARD** sent the CHS the following text:

> **DENNARD**: Great talking with you. I know you called me because you are trying to get some things done. Otherwise, you've been tapped out or too busy. Just to make sure we are going to be okay, please send a little help to me today. Cash Ap is ok. Or I can meet you later? I hate to be transactional but you've kind of made it like that.

14

45. Two days later, on or about November 4, 2019, **DENNARD** texted CHS and said, "Good Morning! Are you around today? I could really use your help. It's kind of urgent to get it today." **DENNARD** continued: "Happy to help you. But need yours too."

46. Similarly, on or about November 13, 2019, **DENNARD** contacted CHS asking for more money, "just about $500," and stated, "As I said, I'm sure there will be ways to help you as well and I will."

47. An analysis of **DENNARD's** personal banking account records from June 3, 2019 to November 21, 2019 indicate numerous cash deposits in an amount totaling $20,295.00. The source of the cash deposits is unknown.

## CONCLUSION

48. Based on the forgoing, I request that the Court issue the proposed criminal complaint, as there is probable cause to believe **DENNARD** has committed honest services wire fraud, in violation of 18 U.S.C. §§ 1346 and 1343, bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666, attempted extortion under color of right, in violation of 18 U.S.C. § 1951.

## REQUEST FOR SEALING

49. I further request that the Court order that all papers in support of this application, including the affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*[signature]*

Nathan Holbrook
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ___Feb. 24___, 2020

*[signature]*
KAREN L. LIKOVITZ
UNITED STATES MAGISTRATE JUDGE